UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CRIMINAL ACTION NO. V-12-20 |
| | § | |
| CECILIO DAVID ROBLES & | § | |
| RICARDO RAMIREZ, | § | |
| | § | |
| Defendants. | | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants' Cecilio David Robles ("Robles") and Ricardo Ramirez ("Ramirez") (collectively "Defendants") Motion to Suppress Evidence (Aliens, Evidence and Statements) (Dkt. No. 28) and supplemental memorandum (Dkt. No. 52), to which the Government has responded (Dkt. No. 55).

## I. Factual and Procedural Background[1]

On March 2, 2012, Lavaca County Sheriff's Deputy Michael W. Gibson ("Gibson") was traveling westbound while patrolling U.S. Highway 90A near the Lavaca County–Colorado County border. At approximately 9:57 A.M., Gibson observed two vehicles—a black Chevrolet Tahoe and a maroon Ford Expedition—traveling eastbound in tandem at a slow rate of speed (55mph in a 70mph zone). Gibson suspected that the Expedition was following too closely behind the Tahoe in violation of Texas Transportation Code § 545.062 and turned his patrol car around to get a closer view of the vehicles. As he turned around, the driver of the Tahoe sped away at a high rate of speed. Gibson activated his takedown lights, but the Expedition did not

---

1. The facts as set forth in this Order are based on the testimony given by Gibson and Pflughaupt at the July 30, 2012 evidentiary hearing on Defendants' motion to suppress (*See* Transcript, Dkt. No. 54), as well as videos of the traffic stops of the Tahoe and Expedition that were admitted into evidence as Government's Exhibits 1 and 3, respectively. Neither defendant testified at the hearing.

1

pull over. Instead, the Expedition continued to travel at a slow rate of speed, effectively blocking Gibson's patrol car and preventing him from catching up to the Tahoe. Unable to get around the Expedition, Gibson informed dispatch of the Expeditions' description and ran a license plate check. After Gibson activated his overheard emergency lights, the Expedition pulled over, and Gibson caught up to the Tahoe as it turned off on a farm-to-market road. Gibson watched the driver of the Tahoe pull off the road into a ditch and flee into a wooded area with approximately 10 to 12 other individuals. Gibson informed dispatch that there was a bailout and that the Expedition may be involved. Gibson also told dispatch to notify deputies from the adjacent Colorado County Sheriff's Department that he needed help stopping the Expedition. Gibson detained six subjects still inside the Tahoe until assistance arrived. While he was waiting for backup, one of the people in the Tahoe who spoke English asked Gibson what happened to the maroon vehicle.

Meanwhile, Colorado County Sheriff's Deputy Lee Pflughaupt ("Pflughaupt") received a call from dispatch that an officer was possibly fighting several individuals in Lavaca County and needed assistance. At 9:59 A.M.,[2] dispatch gave the description of the maroon Expedition, including its license plate, stating that it was also involved in the bailout but had fled the scene. At 10:01 A.M., Pflughaupt pulled over the Expedition, approached the vehicle, and asked the driver to exit the vehicle. Between 10:02 A.M. and 10:04 A.M., Pflughaupt asked the driver and his front seat passenger for their driver's licenses and identified the driver as Defendant Robles and the passenger as Defendant Ramirez. Pflughaupt also patted both men down and asked them about their travel itinerary. At 10:05 A.M., Pflughaupt advised Defendants that they were not currently under arrest; however, Defendants were handcuffed for Pflughaupt's safety and

---

2. The timing of this and other relevant events in this case is reflected in the time stamp on the video of the traffic stop of the Expedition.

detained at the side of the road. At 10:06 A.M., Robles granted Pflughaupt consent to search the vehicle. At 10:07 A.M., Pflughaupt ran a check on Robles' and Ramirez' driver's licenses and instructed dispatch to tell Lavaca County that he had stopped the Expedition and was about to do a vehicle search. At 10:09 A.M., after being shown by Robles how to open the back gate of the Expedition, Pflughaupt conducted a search of the vehicle. Pflughaupt located two cellular phones and two Boost Mobile push-to-talk phones and turned on one of the push-to-talk phones. At 10:15 A.M., another Colorado County Sheriff's Deputy arrived on the scene and assisted Pflughaupt with the search. At some point during the search, Pflughaupt heard someone on one of the push-to-talk phones saying "Come back" and asking, "Where you at?" and "What is going on?"

At 10:29 A.M., Gibson and another deputy with the Lavaca County Sheriff's Department arrived on the scene. Pflughaupt removed his handcuffs from Defendants, and a Lavaca County deputy put his handcuffs on Defendants. Gibson then conducted a search of the vehicle with his K-9 unit, but his search did not uncover any evidence of illegal activity. At 10:37 A.M., Pflughaupt and Gibson began questioning Defendants about the bailout for the first time. At 10:52 A.M., Gibson contacted Agent Torres at the Corpus Christi Border Patrol Station for assistance in identifying and determining the citizenship of the individuals in the Tahoe. At 11:00 A.M., Defendants were arrested by Gibson and taken to the Corpus Christi Border Patrol Station for questioning.

On March 28, 2012, Defendants were indicted on one count each of conspiring to transport unlawful aliens and three counts each of aiding and abetting the transportation of unlawful aliens in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii), 1324(a)(1)(A)(v)(I), 1324(a)(1)(A)(v)(II), and 1324(a)(1)(B)(i).

**II. Defendants' Motion to Suppress**

Defendants' initial motion to suppress focused on the multiple cell phones that were discovered and statements that were overheard after Pflughaupt turned on one of the push-to-talk phones, as well as any inculpatory statements Defendants may have made while handcuffed on the side of the road. Defendants' motion further moved to suppress the presence of the aliens that were being transported in the Tahoe and any statements the aliens made identifying Defendants as being involved in their transport.

During the hearing on Defendants' motion to suppress, defense counsel withdrew its argument that the phones themselves should be suppressed. (Tr. 73:25–74:4.) The Court then orally ruled—and the Government conceded—that Pflughaupt's turning on the phone exceeded the scope of Defendants' consent and was "too much;" thus, any statements that were overheard coming from the phones should be suppressed. (Tr. 78:11–83:20 (citing *United States v. Curtis*, 635 F.3d 704 (5th Cir. 2011); *United States v. Finley*, 477 F.3d 250 (5th Cir. 2007); *United States v. Butler*, 2012 WL 1819015 (5th Cir. May 18, 2012)).) The Government further represented to the Court that it would not offer any statements made by Defendants into evidence at trial. (Tr. 72:24–73:3.)

The Court also orally ruled that the initial stop was lawful under *Terry*. (Tr. 83:25–84:9.) Defense counsel thereafter conceded that the initial stop was lawful, but nonetheless argued that Defendants' "arrest[s] in general [were] a violation of their Fourth Amendment rights" because they were "unlawfully detained for an extended amount of time that exceeded the scope of the investigation by Pflughaupt and the subsequent law enforcement officers." (Tr. 85:17–86:1; Dkt. No. 52 at 2.) As such, Defendants maintain that the presence of the aliens and any identification statements made by the aliens should be suppressed under the exclusionary rule.

**III. Legal Standard**

The exclusionary rule is a jurisprudential construct designed for the purpose of deterring "future unlawful police conduct and thereby effectuat[ing] the guarantee of the Fourth Amendment against unreasonable searches and seizures[.]" United *States v. Calandra*, 414 U.S. 338, 347 (1974); *see also Weeks v. United States*, 232 U.S. 383 (1914). Under the exclusionary rule, which "was adopted to effectuate the Fourth Amendment right of all citizens, . . . evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *Id.* The rule excludes not only the illegally obtained evidence itself, but also other incriminating evidence derived from that primary evidence, or "fruit of the poisonous tree." *Segura v. United States*, 468 U.S. 796, 804 (1984).

A traffic stop constitutes a seizure under the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). Routine traffic stops, being closer in nature to investigatory detentions rather than a full blown arrest, are governed by the principles set out in *Terry v. Ohio*, 392 U.S. 1 (1968). *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984); *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc). The legality of a police investigatory stop under *Terry* is assessed in two parts: (1) whether the officer's action was justified at its inception, and (2) whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop. *Terry*, 392 U.S. at 19–20; *Brigham*, 382 F.3d at 506.

As recognized, *supra*, the Court has already determined that the stop itself was legal under *Terry*. Thus, under the second prong of *Terry*, the Court must determine whether the officers' actions after the stop were reasonably related in scope to the circumstances that justified the stop. *Terry*, 392 U.S. at 19–20; *Brigham*, 382 F.3d at 506. As the Supreme Court observed, "[t]he manner in which the seizure . . . [was] conducted is, of course, as vital a part of the inquiry

5

as whether [it was] warranted at all." *United States v. Place*, 462 U.S. 696, 708–09 (1983) (citing *Terry*, 392 U.S. at 28)). "[T]he correct analysis requires district courts to consider the facts and circumstances of each case, giving due regard to the experience and training of the law enforcement officers, to determine whether the actions taken by the officers, including the length of the detention, were reasonable under the circumstances." *Brigham*, 382 F.3d at 507. It is the government's burden to demonstrate that the seizure it seeks to justify on the basis of reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure. *Florida v. Royer*, 460 U.S. 491, 500 (1983).

## III. Analysis

It is unclear exactly when Defendants allege their detention became illegal. Defendants' motion and memorandum in support also fail to address in any detail whether or not there was reasonable suspicion to connect them to the aliens in the Tahoe or whether there was probable cause for their eventual arrest. Instead, Defendants focus mainly on the timing of their detention. Specifically, Defendants argue that the search, albeit by consent, was conducted merely to delay their detention for the purpose of having another law enforcement agency come to the scene at some later unknown time. Defendants further claim that Pflughaupt's "o[w]n statements on scene when he acknowledged that he did not have a reason to keep them there" serve as additional evidence that their detention was unjustified. (Dkt. No. 52 at 2.)

Defendants are correct that Pflughaupt acknowledged on the video and during the hearing that he, personally, did not have any reason to hold Defendants. However, because Pflughaupt stopped the Expedition "in reliance on the dispatcher bulletin, [he] therefore [was] not required to have personal knowledge of the evidence that created [Gibson's] reasonable suspicion." *See United States v. Ibarra-Sanchez*, 199 F.3d 753, 759 (5th Cir. 1999) (citing *United States v.*

*Hensley*, 469 U.S. 221 (1985)). Instead, if Gibson "possessed sufficient reasonable suspicion to stop the [Expedition] when he made his call to the dispatcher, then the actual stop by [Pflughaupt], acting on the dispatcher's bulletin, was also supported by reasonable suspicion." *See Id.* Any evidence uncovered during the stop is also admissible "if the stop that in fact occurred was not significantly more intrusive than would have been permitted the issuing department." *Hensley*, 469 U.S. at 233 (internal citations omitted).

The Court finds that Gibson possessed a reasonable suspicion, based on specific and articulable facts, that Defendants were involved in alien smuggling at the time he issued the bulletin to stop the Expedition. Specifically, Gibson testified that Highway 90 is a highly traveled road for smuggling humans and that it was very common for transporters of illegal aliens to have lead and follow cars. Gibson observed the Tahoe and Expedition driving in tandem, and after the Tahoe sped off, the Expedition kept driving at a slow rate of speed, which initially prevented Gibson from going around. Gibson then witnessed the bailout from the Tahoe, which further increased his suspicion that the Expedition was acting as a follow car for the Tahoe as it smuggled illegal aliens.

Pflughaupt also testified that lead or chase vehicles are common in alien smuggling operations; thus it was not unreasonable for Pflughaupt to rely on Gibson's bulletin that the Expedition was likely connected to the vehicle involved in the bailout. Because Gibson possessed reasonable suspicion justifying a stop of the Expedition, and Pflughaupt made the stop in objective reliance on the dispatcher's bulletin, the issue the Court must decide is whether Defendants' detention by Pflughaupt was more intrusive than would have been permitted by Gibson.

Because Gibson would have been authorized to order Defendants to exit the Expedition had he pulled over their vehicle, Pflughaupt was therefore justified in doing the same. *See Ibarra-Sanchez*, 199 F.3d at 161. Likewise, Pflughaupt was legally justified in asking Defendants for their identification when he pulled them over. *See Brigham*, 382 F.3d at 509. Pflughaupt also acted lawfully when he conducted a search of Defendants' vehicle, as Defendants admittedly gave him consent to do so. *United States v. Garcia*, 604 F.3d 186, 190 (5th Cir. 2010). With respect to the issue of whether Pflughaupt acted lawfully when he continued to detain Defendants until Gibson could take them into custody—and therefore whether any evidence uncovered as a result of their detention should be suppressed—the Court finds two Supreme Court cases instructive.

In *United States v. Sharpe*, a DEA agent noticed an overloaded truck driving in tandem with a Pontiac in an area under surveillance for drug trafficking and notified the local authorities. 470 U.S. 675, 677 (1985). When they attempted to stop the vehicles, the Pontiac pulled over to the side of the road, but the truck continued on. *Id.* at 678. The DEA agent pulled up behind the Pontiac, requested identification, and radioed the local police for assistance. *Id.* When local police arrived, the DEA agent asked them to "maintain the situation" with the Pontiac and left to catch up with the truck. *Id.* Meanwhile, the state officer was able to pull the truck over further down the road and held the driver until the DEA agent arrived approximately 15 minutes later. *Id.* at 678-79. Within minutes after his arrival, the DEA agent confirmed that the truck contained marijuana and arrested the truck driver. *Id.* at 679. The DEA agent then returned to the Pontiac and arrested its driver and passenger, approximately 30 to 40 minutes after he had originally pulled the car over. *Id.* After both drivers were charged with possession with intent to distribute a controlled substance, they moved to suppress the evidence of the marijuana on the grounds that

their detentions were excessive and therefore unlawful. *Id.* at 680. The district court denied the motions and defendants were convicted; however, and a divided panel of the Court of Appeals for the Fourth Circuit reversed the convictions, finding "the investigative stops unlawful because they 'failed to meet the requirement of brevity' thought to govern detentions on less than probable cause.'" *Id.*

On certiorari, the Supreme Court first found that it was unnecessary to decide whether the Pontiac driver's detention was unreasonable, since that detention bore no causal relationship to the discovery of the marijuana in the truck. *Id.* at 684. In denying the truck driver's claim that his 20-minute detention was excessive, the Court reiterated its position that it would not create rigid time limitations on *Terry* stops. *Id.* at 686. Instead, the proper focus in assessing whether a detention has exceeded the scope of *Terry* is to examine "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Id.* A court should not simply question "whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." *Id.* at 687. Ultimately, the Court concluded that there was no evidence that the officers were dilatory in their investigation, and the 20-minute detention was not unreasonable. *Id.* at 687–88.

In *United States v. Hensley*, a St. Bernard, Ohio police officer issued a "wanted flyer" to other police departments in the area, which stated that Hensley was wanted for investigation of an armed robbery in St. Bernard and asked other departments to "pick up and hold" Hensley for the St. Bernard police. 469 U.S. 221, 223 (1985). A few days later, officers from the nearby Covington, Ohio Police Department who had read the flyer saw Hensley and pulled his car over. *Id.* at 224. After ordering Hensley and his passenger—who one Covington officer recognized as

a convicted felon—out of the car, the officers observed the butt of a revolver protruding from under the passenger seat. *Id.* A search of the car uncovered two additional firearms, and the two men were arrested. *Id.* at 224–25. After Hensley was charged with being a felon in possession of a firearm, he moved to suppress the handguns from evidence on the grounds that the Covington police had impermissibly stopped him in violation of the Fourth Amendment. *Id.* at 225.

In affirming the district court's order denying the motion, the Supreme Court concluded that it was "irrelevant whether the Covington officers intended to detain Hensley only long enough to confirm the existence of a warrant, or for some longer period; what matters is that the stop and detention that occurred were in fact no more intrusive than would have been permitted an experienced officer on an objective reading of the flyer. *Id.* at 234–35. The Court then went on to explain:

> To be sure, the St. Bernard flyer at issue did not request that other police departments briefly detain Hensley merely to check his identification or confirm the existence of a warrant. Instead, it asked other departments to pick up and hold Hensley for St. Bernard. Our decision today does not suggest that such a detention, whether at the scene or at the Covington police headquarters, would have been justified. Given the distance involved and the time required to identify and communicate with the department that issued the flyer, such a detention might well be so lengthy or intrusive as to exceed the permissible limits of a *Terry* stop. Nor do we mean to endorse St. Bernard's request in its flyer for actions that could foreseeably violate the Fourth Amendment. We hold only that this flyer, objectively read and supported by a reasonable suspicion on the part of the issuing department, justified the length and intrusiveness of the stop and detention that actually occurred.

*Id.* at 235 (internal citation omitted).

Here, the evidence shows that, within one minute of stopping Defendant's vehicle, Pflughaupt asked Defendants for identification. Within six minutes after the stop, Pflughaupt ran a check on Defendants' driver's licenses and notified dispatch of his location so that Gibson and the Lavaca County Sheriff's Department could take custody of Defendants. Pflughaupt was

aware from the previous dispatch that Gibson was nearby, and roughly 20 minutes later, Gibson arrived at the scene. Almost immediately, Gibson's canine searched the vehicle, and he and Pflughaupt questioned Defendants about the bailout. Gibson then contacted Border Patrol to determine whether the individuals in the bailout were in fact unlawful aliens. Approximately 30 minutes after Gibson arrived on the scene, and one hour after Defendants were initially pulled over, they were arrested.

The Court finds that Defendants' 28-minute detention, during which Pflughaupt waited for Gibson to arrive and take custody of Defendants, was reasonable under the circumstances. *See United States v. Pack*, 612 F.3d 341, 361–62 (5th Cir. 2010) (holding that, while law enforcement officer detained occupant of motor vehicle beyond time needed to investigate speeding infraction that caused him to stop vehicle, suspect's continued detention for no more than 35 minutes after initial stop, until drug-sniffing dog could be brought to the scene, did not violate the Fourth Amendment). The Court need not consider whether Defendants' additional 31-minute detention after Gibson arrived was reasonable, however, because Defendants have failed to show that any evidence was discovered as a result of that detention.

Moreover, even if Defendants' one-hour detention was excessive, Defendants have failed to show that the evidence they wish to suppress—namely the presence of the aliens and any identifying statements the aliens made—was obtained as a result of their detention by either officer. Because the aliens were found inside the Tahoe, and not the Expedition, the aliens are not the "fruit" of Defendants' detention. *See Sharpe*, 470 U.S. at 683 (concluding that because "the marihuana was in Savage's pickup, not in Sharpe's Pontiac; the contraband . . . cannot logically be considered the 'fruit' of Sharpe's detention). With respect to the aliens' identifying statements, defense counsel stated during the hearing that the aliens were able to identify

Defendants "through the taking of their driver's license, their keeping their driver's license[,] and showing pictures from the [Department of Public Safety] from those driver's licenses for [the aliens] to identify." (Tr. 75:20–24.) The Government responded that this claim was "totally false" (Tr. 76:15–21), and Defendants have presented no evidence in support of their claim that Pflughaupt, Gibson, or any other member of law enforcement kept their licenses to show the aliens in a photo lineup. Even if Pflughaupt discovered Defendants' identities from their driver's licenses, and another law enforcement agency later used this information to pull up Defendants' pictures from the DPS database to show the aliens for identification purposes, as recognized *supra*, Pflughaupt was legally justified in asking Defendants for their driver's licenses when he stopped the Expedition. Pflughaupt also asked for Defendants' identification immediately after he pulled them over, and not after they had been detained for any period of time. Because Pflughaupt did not obtain access to Defendants' identifying documents in violation of the Fourth Amendment, any identification statements the aliens made are not "fruit of the poisonous tree."

## IV. Conclusion

For the aforementioned reasons, Defendants' Motion to Suppress Evidence (Aliens, Evidence, and Statements) (Dkt. No. 26) is **DENIED**.

It is so **ORDERED**.

**SIGNED** this 28th day of September, 2012.

_____
JOHN D. RAINEY
SENIOR U.S. DISTRICT JUDGE